[No. 1509-2.   Division Two.   August 8, 1975.]

THE STATE OF WASHINGTON, *Respondent*, v. GERALD R. LAM-
MERT, *Appellant.*

*William Cullen, Jr.,* for appellant.

*Patrick D. Sutherland, Prosecuting Attorney,* and *Rich-
ard Strophy, Deputy,* for respondent.

RUMMEL, A.C.J.*—The defendant was convicted of arson
in the first degree and sentenced by the court to not less
than 5 years nor more than 20 years. He was accused of
pouring gasoline in the trailer in which he and his wife
lived, and setting it on fire. They were divorced subsequent
to the act, but before the trial. The defendant contends that
his former wife should have been barred from testifying
against him by RCW 5.60.060(1), the pertinent part of
which is:

> A husband shall not be examined for or against his
> wife, without the consent of the wife, nor a wife for or
> against her husband without the consent of the husband;
> nor can either during marriage or afterward, be without

---

*Judge Bartlett Rummel is serving as a judge pro tempore of the
Court of Appeals pursuant to Laws of 1973, ch. 114.

the consent of the other, examined as to any communication made by one to the other during marriage. But this exception shall not apply . . . to a criminal action or proceeding for a crime committed by one against the other, . . .

Testimony of the wife was that she had filed for divorce because he tried to choke her, pulled a .22 caliber revolver out and threatened to kill her in front of three teenagers, and on another occasion broke the windshield on her car. She was sitting in the trailer on the day of the arson when he appeared carrying a can. A portion of her testimony is as follows:

A. And all at once the door opens, Gerry comes in. I said, "What in the hell are you doing?" He said, "What do you think?" He came towards me—came towards me, had the can and was taking the top off it, and was doing that while he was walking and talking; *he came back and he pushed me backwards,—*

Q. Now where did you go when he pushed you?

A. On the daveno. I was just shortly in front of it.

Q. And where was he in the house trailer?

A. Well, he came in, up towards me.

. . .

Q. And then were you in a position to observe Mr. Lammert after he pushed you on the davenport?

A. Yes.

Q. And what did he do?

A. Started backing up, pouring gas on the floor.

Q. Mrs. Lammert, would you explain now how he poured it?

A. Just tipped the can up, started making a trail of gas back through the trailer.

Q. You say, "gas," — how do you know it was gas?

A. From the smell.

Q. And what did you do?

A. As he went by the door, I jumped up and I ran over to the door and out the door to Dara's.

Q. When you jumped up, —would you describe it? Did he make any motion or say anything?

A. I don't recall him saying anything. He might have. He did. He reached in the pocket of his pants with his hand and I was afraid he was going to pull a gun, —

Q. Why?

A. He threatened me with it before. He had told me he would kill me.

Q. When he done this?

A. Well, several different times he told me that if I wasn't going to live with him, I wouldn't live with anyone.

Q. Did he say that on that night?

A. No.

(Italics ours.) On cross-examination her testimony was this:

Q. He made no move to prevent you from going out?

A. He couldn't.

Q. And he was at the other end of the trailer at that time when you went out the door, wasn't he?

A. No, he was in the kitchen.

Q. He was in the kitchen. And he didn't say that he was going to kill you or to harm you or anything, did he?

A. I don't remember whether he said anything or not.

Q. And he has threatened, has he not, to commit suicide himself, hasn't he?

A. Well, yes, if I wouldn't come back to him.

Q. Now there was nothing to prevent you from going out of that trailer, was there?

A. When?

Q. When you left.

A. No, not as long as I was faster than he was to the door.

Q. How far were you sitting from the door?

A. I don't have the measurements on the trailer. I was on the front daveno. He knows the measurements better than I do, because he has measured it to put in carpet.

Q. That's just a matter of feet, isn't it?

A. (Shaking head, no.)

Q. And he was headed towards the other end of the trailer, as you went out the door?

A. Right. He was just the other side of the door.

Q. He had gone through the whole trailer, had he not?

A. He had not.

Q. And he had gone into the bedroom?

A. Nope.

Q. Were you sitting at this end here? (Indicating on sketch.)

A. Right.

Q. And then he went into this area and you got up and went out the door? (Indicating on sketch.)

A. I got up as soon as he had gone by the door.

Q. Yes. And you were afraid that he might shoot you?

A. Shoot me, choke me, —anything.

Q. But he didn't choke you and he didn't shoot you and you didn't see a gun?

A. No, I never said that I seen a gun.

Q. And he didn't make any threats on your life?

A. Well, not verbally, that night, no.

Q. And so you just thought that discretion being the better part of valor, you were going to get the heck out of there?

A. With someone pouring gas, —

Q. Would you answer that question?

MR. RATHBONE: Excuse me, I think the way Mr. Long phrased the question, prompted the reply, "With someone pouring gas."

A. Yes, I took that as a threat to my life.

Q. So you left?

A. Yes.

Q. And were you inside this other trailer when the explosion occurred?

A. Yes, by the other window.

Our court has stated that the crime must be one of personal violence against the wife and not against her property alone to cause her testimony to be admissible. *State v. Moxley*, 6 Wn. App. 153, 491 P.2d 1326 (1971). *Moxley* was also an arson case except that the wife was asleep in the house with her children when the fire was set by the defendant. The court found the facts to indicate it was a crime of personal violence against the wife and not just against her property. Although in the instant case the facts are not as conclusive, it is our opinion that the arson was a crime of personal violence against the wife.

■ A divorced wife may testify as to acts and facts occurring during the marriage relation when her testimony does not involve communications made by him to her arising from the confidence induced by such relation. *State v. Snyder*, 84 Wash. 485, 147 P. 38 (1915); *State v. Americk*,

42 Wn.2d 504, 256 P.2d 278 (1953). There was no such communication in the instant case.

The trial took place on August 10, 1971, but the appellant was not sentenced until June 5, 1974, a lapse of 2 years and 10 months. He now asserts that his constitutional right to due process was violated by the delay.

It appears that the deputy prosecuting attorney, who represented the State at the trial, entered private practice about a month after the trial. Apparently due to the change of prosecutors, findings of fact and conclusions of law were not entered until March 8, 1973, although they were prepared in late 1972. They were then submitted to the attorney for the defense for approval, and there was some delay in their return. The matter was noted for sentencing on December 5, 1972, but the defendant failed to appear. His counsel stated that he did not know the defendant's whereabouts despite the fact that counsel had "telephoned up and down the states of Washington and Idaho" in an attempt to locate him. Also, during part of the period of delay, the defendant was engaged in construction work in Montana for several months, during which time he was convicted of an assault. The court there provided that time served on the Washington case should be credited to the Montana sentence. Apparently the ultimate locating of the defendant was a result of the Montana prosecution.

The questions presented by this appeal relative to a delay in sentencing are of first impression in this state. However, in *Erbe v. State*, ......... Md. ........., 336 A.2d 129 (1975) the Court of Special Appeals of Maryland in an almost parallel case extensively discussed the issues of law presented to us. We are impressed by the thorough treatment of these issues by the Maryland court and agree with its conclusions. Because of the complete coverage there of the legal questions in the case at bench, we feel it unnecessary to do more than to summarize here, and we adopt the opinion of the Maryland court as decisive of the case before us.

In *Erbe v. State, supra*, the court said at pages 136-37:

We hold that the constitutional right to a speedy trial does not apply to the penalty stage of the proceedings and that delay in the imposition of sentence is to be tested by due process standards.

. . . We see no violation of due process of law in the unique circumstances here existent. The delay in sentencing was due to administrative misadventure; it was not purposeful or oppressive. There was patently no deliberate attempt to hamper Erbe. Rather, there was inadvertent inaction. The fault was accidental in conception, venial in effect, and remedied as promptly as possible when known. The key is that had Erbe felt at any time truly aggrieved by the failure to impose sentence he need only have so indicated to his counsel, to the State or to the court. He at all times knew that he had been convicted (on appeal he does not challenge the propriety of his conviction), that he had been released in the custody of his lawyer, and that he was awaiting sentence. It was not until it came to the attention of the court that sentence had not been imposed, and Erbe was apprehended by a quirk of fate after failing to appear in answer to a served summons, that he became dissatisfied with his status. Not only did he maintain silence, but he failed to keep in touch with his attorney and did not inform him or the court of his many changes of address. It is manifest that, until taken into custody, he was perfectly content to enjoy the status quo.

In *Pollard v. United States*, 352 U.S. 354, 1 L. Ed. 2d 393, 77 S. Ct. 481 (1957), the Supreme Court in a case involving the legality of a sentence stated at page 361: "The delay must not be purposeful or oppressive. It was not here. It was accidental and was promptly remedied when discovered."

The delay in the instant case was not purposeful nor oppressive. We agree with the Supreme Court in *Pollard v. United States, supra* at 362, when it said: "Error in the course of a prosecution resulting in conviction calls for the correction of the error, not the release of the accused."

Affirmed.

COCHRAN and WIEHL, JJ. Pro Tem., concur.

Petition for rehearing denied October 6, 1975.